**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KATIE JACKSON, individually, and on behalf of all others similarly situated, | Case No. 1:24-cv-04178 |
| Plaintiffs, | |
| v. | Judge Mary M. Rowland |
| WALGREEN PHARMACY SERVICES MIDWEST, LLC, | Magistrate Gabriel A. Fuentes |
| Defendant. | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR CONDITIONAL CERTIFICATION AND PROPOSED NOTICE**

DATED: January 6, 2025

Respectfully submitted,

WALGREEN PHARMACY SERVICES
MIDWEST, LLC

By: */s/ Kyle A. Petersen*
    One of Its Attorneys

Kyle A. Petersen
Bryan J. Vayr
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
(312) 460-5000
kpetersen@seyfarth.com
bvyar@seyfarth.com

Esteban Shardonofsky
SEYFARTH SHAW LLP
700 Milam Street, Suite 1400
Houston, Texas 77002
(713) 225-1001
sshardonofsky@seyfarth.com

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ALLEGATIONS AND FACTS ............................................................ 2

    I.    Plaintiff's Allegations and Defendant's Centralized Services Department. ........... 2

    II.    Defendant's Policies Mandate Recording of and Payment for All Hours Worked. ................................................................................................................. 3

    III.    Agents Are Trained to Record All Hours Worked and Report Any Inaccuracies. ................................................................................................... 4

    IV.    Defendant Uses Time Punches to Evaluate Attendance and Provides Grace Periods and Corrections for Reported Issues. ......................................... 8

    V.    Defendant's "Schedule Adherence" Metric is Unrelated to Hours Worked, Compensation, or Attendance. ................................................................ 9

LEGAL STANDARD ...................................................................................................... 10

ARGUMENT .................................................................................................................... 11

    I.    The Court Should Decline To Apply The Two-Phased Certification Process. ................................................................................................................ 11

    II.    There is No Evidence of An Unlawful Policy, Let Alone a Collective-Wide One. ............................................................................................................ 13

        A.    Plaintiff Fails to Evince An Unlawful Common Policy or Practice. ........ 13

        B.    The Remaining Evidence Belies Any Unlawful Common Policy or Practice. ................................................................................................... 19

    III.    Individualized Inquiries Render Collective Action Treatment Inappropriate. ................................................................................................... 20

    IV.    Plaintiff's Proposed Notice and Notice Process Should Be Modified. ................. 23

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo v. Ace Coffee Bar, Inc.*,
    248 F.R.D. 550 (N.D. Ill. 2008)............................................................................15

*Adair v. Wis. Bell., Inc.*,
    2008 WL 4224360 (E.D. Wis. Sept. 11, 2008)...........................................12, 15, 16

*Amandah v. Alro Steel Corp.*,
    2020 U.S. Dist. LEXIS 151723 (E.D. Wis. Aug. 21, 2020) ...................................16

*Andrade v. Aeroteck, Inc.*,
    No. CCB08–2668, 2009 WL 2757099 (D.Md. Aug. 29, 2009) ............................24

*Atkinson v. TeleTech Holdings, Inc.*,
    2015 U.S. Dist. LEXIS 23630 (S.D. Ohio Feb. 26, 2015)......................................25

*Babayemi v. Now Courier, Inc.*,
    2023 WL 8236987 (S.D. Ind. Nov. 28, 2023) .......................................................24

*Blakes v. Ill. Bell Tel. Co.*,
    2013 U.S. Dist. LEXIS 176496 (N.D. Ill. Dec. 17, 2013).........................18, 19, 22

*Blakes v. Ill. Bell Tel. Co.*,
    75 F. Supp. 3d 792 (N.D. Ill. 2014) .....................................................................17

*Boyd v. Alutiiq Glob. Sols., LLC*,
    2011 U.S. Dist. LEXIS 88656 (N.D. Ill. Aug. 8, 2011)....................................15, 16

*Bradley v. Arc of Nw. Ind., Inc.*,
    2015 U.S. Dist. LEXIS 60985 (N.D. Ind. May 11, 2015) ......................................15

*Brianas v. Under Armour, Inc.*,
    2018 WL 2184448 (D. Md. May 11, 2018) ...........................................................21

*Calloway v. AT&T Servs.*,
    2024 U.S. Dist. LEXIS 57008 (N.D. Ill. Mar. 28, 2024).........................................11

*Calloway v. AT&T Servs., Inc.*,
    2024 WL 1328823 (N.D. Ill. Mar. 28, 2024).........................................................12

*Carrel v. Medpro Grp., Inc.*,
    2016 WL 4884157 (N.D. Ind. Sept. 15, 2016) .....................................................24

*Clugston v. Shamrock Cartage & Spotting Servs.*,
    2014 WL 5502455 (S.D. Ind. Oct. 30, 2014) .......................................................24

*DePyper v. Roundy's Supermarkets, Inc.*,
2020 WL 6565225 (N.D. Ill. Nov. 9, 2020) ...........................................................................24

*Drummond v. Am. Fam. Mut. Ins. Co., S.I.*,
2023 WL 2770563 (W.D. Wis. Apr. 4, 2023) .........................................................................24

*Fillipo v. Anthem Companies, Inc.*,
2022 WL 18024818 (S.D. Ind. Dec. 30, 2022).......................................................................11

*Flores v. Lifeway Foods, Inc.*,
289 F. Supp. 2d 1042 (N.D. Ill. 2003) .......................................................................11, 12, 16

*Forney v. TTX Co.*,
2006 WL 1030194 (N.D. Ill. Apr. 17, 2006) ..........................................................................11

*Fosbinder-Bittorf v. SSM Health Care of Wisconsin, Inc.*,
2013 WL 3287634 (W.D. Wis. Mar. 21, 2013).......................................................................25

*Hickmon v. Fun & Fit LLC*,
2021 WL 3578296 (S.D.N.Y. Aug. 13, 2021) .........................................................................16

*Hudgins v. Total Quality Logistics, LLC*,
2016 WL 7426135 (N.D. Ill. Dec. 23, 2016) ..........................................................................24

*Laverenz v. Pioneer Metal Finishing, LLC*,
2024 WL 3887110 (E.D. Wis. Aug. 21, 2024) ........................................................................12

*Martinez v. Cargill Meat Sols.*,
265 F.R.D. 490 (D. Neb. 2009)................................................................................................24

*Modise v. Careone Health Services, LLC*,
2021 WL 3421711 (D. Conn. Aug. 5, 2021) ...........................................................................16

*Muir v. Guardian Heating & Cooling Services, Inc.*,
2017 WL 959028 (N.D. Ill. Mar. 13, 2017).............................................................................23

*Nehmelman v. Penn Nat'l Gaming, Inc.*,
822 F. Supp. 2d 745 (N.D. Ill. 2011) ......................................................................................12

*Pfaahler v. Consultants for Architects, Inc.*,
2000 WL 198888 (N.D. Ill. Feb. 8, 2000) ..............................................................................11

*Piazza v. New Albertsons, LP*,
2021 WL 365771 (N.D. Ill. Feb. 3, 2021) .........................................................................23, 24

*Reyes Cruz v. 70-30 Austin St. Bakery Inc.*,
2019 WL 1929910 (S.D.N.Y. May 1, 2019) ...........................................................................15

*Richardson v. Wells Fargo Bank, N.A.*,
2012 WL 334038 (S.D. Tex. Feb. 2, 2012) .......................................................................18, 19

*Richie v. Blue Shield of California*,
    2014 WL 6982943 (N.D. Cal. Dec. 9, 2014) ..........................................................................17

*Ruffolo v. LaSalle Grp., Inc.*,
    2019 WL 978659 (N.D. Ill. Feb. 28, 2019) ..........................................................................23

*Slaughter v. Caidan Mgmt. Co., LLC*,
    317 F. Supp. 3d 981 (N.D. Ill. 2018) ..........................................................................24

*Smith v. Family Video Movie Club, Inc.*,
    2015 WL 1542649 (N.D. Ill. Mar. 31, 2015) ..........................................................................23

*Steger v. Life Time Fitness, Inc.*,
    2016 WL 245899 (N.D. Ill. Jan. 21, 2016) ..........................................................10, 11, 17, 23

*Swales v. KLLM Transp. Servs., LLC*,
    985 F.3d 430–43 (5th Cir. 2021) ..........................................................................11, 12, 13

*Tom v. Generac Power Sys.*,
    2018 U.S. Dist. LEXIS 130629 (E.D. Wis. Aug. 3, 2018) ..............................................16, 19

*Vazquez v. Ferrara Candy Co.*,
    2016 WL 4417071 (N.D. Ill. Aug. 19, 2016) ..........................................................................11

*Walker v. Honghua Am., LLC*,
    870 F. Supp. 2d 462 (S.D. Tex. 2012) ..........................................................................23

*Weil v. Metal Techs., Inc.*,
    925 F.3d 352 (7th Cir. 2019) ..........................................................................11, 12

*Wilmoth v. Steak N Shake, Inc.*,
    No. 2022 WL 1913026 (S.D. Ind. June 3, 2022) ..........................................................23, 24

*Woods v. N.Y. Life Ins. Co.*,
    686 F.2d 578 (7th Cir. 1982) ..........................................................................12

*Wynn v. Express, LLC*,
    2012 WL 874559 (N.D. Ill. Mar. 14, 2012) ..........................................................................16

**Statutes**

29 U.S.C. § 216(b) ..........................................................................10, 11

29 U.S.C. § 256(b) ..........................................................................25

## **TABLE OF EXHIBITS**

| Exhibit Number | Document |
|---|---|
| 1 | Decl. of C. Bareford |
| 2 | Overtime Policy |
| 3 | Decl. of N. Monroe |
| 4 | Timekeeping Policy |
| 5 | Recording Time Worked Policy |
| 6 | Decl. of S. Yusuf |
| 7 | Decl. of J. Sherman |
| 8 | Time Clock Policy |
| 9 | Decl. of M. Beavan |
| 10 | Decl. of K. Gonzalez |
| 11 | Decl. of T. Boyd |
| 12 | Decl. of T. Hunter |
| 13 | Decl. of A. Hosein |
| 14 | Attendance Policy |
| 15 | Decl. of Kim Wamsley |
| 16 | Work Avoidance Policy |

## INTRODUCTION

In this action under the Fair Labor Standards Act ("FLSA"), Plaintiff Katie Jackson alleges she and other "hourly call center agents" employed by Defendant were forced to work off-the-clock while loading or shutting down their work-related computer software, resulting in unpaid overtime. Plaintiff now seeks to conditionally certify a collective of "hourly call center agents" that potentially includes 13,500-plus employees who report (either in person or remotely) to offices across seven states and have approximately 35 different job titles. Plaintiff conducted no discovery. Undaunted—indeed, perhaps to her advantage, under the odd incentives created by the commonly-applied *Lusardi* standard—Plaintiff seeks to have this Court authorize notice to this putative collective based on only three almost identical, boilerplate declarations: her own and from two other Opt-Ins, Sheridan Brantley and Tatiana Clark (collectively with Jackson, the "Plaintiffs") who, like Plaintiff, worked remotely and whom all reported to the same office.

Plaintiff's Motion should be denied.[1] Plaintiff's Motion speaks to Defendant's policies and training in broad and generalized terms, but her actual evidence takes a different tack. Plaintiff does not provide competent or admissible testimony about Defendant's policies, training, or on-the-job instructions on when a so-called "Agent"[2] is supposed to clock in or out or whether loading or shutting down software should be done "on the clock". Instead, Plaintiff's scant evidence reveals that her actual claim is that she *felt* forced or pressured by Defendant's attendance policy

---

[1] Defendant reiterates its position that, to avoid re-briefing, court-authorized notice should be stayed until the Seventh Circuit lays down the proper standard in its upcoming *Richards* opinion. *See* (ECF #23) (Motion to Stay); (ECF #32) (Reply in Support of Motion to Stay). However, Plaintiff's evidence falls short under any standard.

[2] In her Motion, Plaintiff defines Agents as "hourly, non-exempt call center agents under various job titles, such as Pharmacy Technician, Centralized Specialist, Call Center Representative, Overnight Call Center Representative, or similar positions . . . who work remotely from their homes providing customer and pharmacy support to Defendant's pharmacists and customers throughout the United States." (ECF No. 17 at 2.) For purposes of this Response only, and without waiving any arguments to the contrary, Defendant utilizes Plaintiff's definition of "Agents."

and "schedule adherence" metric—neither of which she defines or explains and which have nothing to do with Defendant's timekeeping policies or compliance—to boot up and shut down her work applications off-the-clock. According to Plaintiff, she did so because it took "too long" to complete immediately after starting her shift. But placed in context, Plaintiff's behavior can only be explained as either (1) a misunderstanding of Defendant's policies, or (2) a conscious choice to violate Defendant's timekeeping policies in a (fruitless) effort to artificially increase her adherence metric—and neither explanation is a basis for conditional certification.

Plaintiff's evidences comprises three individuals'—or 0.0002% of her proposed 13,500-plus employee collective—limited experience with and self-serving interpretation of Defendant's lawful policies (which directly contradicts what the policies actually say) while working remotely. They have no insight or personal knowledge about how the thousands of others employees (who worked remotely or in various call centers) approached these issues. Defendant has endeavored to tell the full story. Alongside this Response, the Court will find copies of Defendant's applicable lawful policies and training materials; testimony from those who trained thousands of "Agents" over the years, including some of the Plaintiffs; and first-hand accounts from employees and team leaders who live the topics at issue every time they start or end a shift—and who do not work off the clock. Ultimately, the record shows there is no justification for the Court to authorize notice to the sweeping collective proposed by Plaintiff. Her Motion should be denied in its entirety.

## BACKGROUND ALLEGATIONS AND FACTS

### I.    Plaintiff's Allegations and Defendant's Centralized Services Department.

Plaintiff filed her Motion for Conditional Collective Certification and Court-Authorized Notice to Potential Opt-In Plaintiffs, asking the Court to authorize notice to all hourly call center "Agents" who worked for Defendant from three years preceding the action to the present. Plaintiff, who only worked for Defendant from March through September 2023, claims her personal

2

experience shows Defendant has an unlawful policy requiring all Agents across the country to perform work—specifically, logging into or out of their work-related programs, *e.g.* Outlook and Teams—off-the-clock and without pay, resulting in unpaid overtime. (ECF No. 18 at 6-7.)

Plaintiff's Motion is based solely on Plaintiffs' seeming individual misinterpretation of clear and lawful employment policies and job duties they performed from their homes. Plaintiffs provide no competent or admissible evidence as to the job duties or work experiences of the thousands of other Agents who work from home or in Defendant's many facilities across the country. Plaintiffs do not have knowledge of how others performed their jobs or whether they followed Defendant's policies requiring they boot up and shut down work software on-the-clock. Defendant fills in the blanks below, demonstrating that Plaintiff has not met her burden of showing she and all Agents were collectively subjected to a common, *unlawful* policy.

Plaintiffs were employees in Defendant's Centralized Services Department, which operates call centers in seven states—Alabama, Arizona, Arkansas, Delaware, Florida, Minnesota, and Oklahoma—and Puerto Rico. (Ex. 1, Decl. of C. Bareford, ¶¶ 4–6). Plaintiffs worked on a fully remote basis from home but reported to Defendant's office in Florida. (ECF No. 18-4, 18-5, & 18-6 at ¶ 1.) Plaintiff Jackson and Opt-In Sheridan Brantley were Level I "Pharmacy Technicians," and Opt-In Tatiana Clark was a Level I "Centralized Specialist." (*Id.*) Over the last three years, the Department employed over 13,500 employees with the terms "Pharmacy Technician" (approximately 8,000) or "Specialist" (approximately 5,600) in their title. (Ex. 1, Decl. of C. Bareford, ¶4). Approximately 7,100 of these 13,500 employees work remotely. (*Id.* at ¶9).

## II.    Defendant's Policies Mandate Recording of and Payment for All Hours Worked.

Defendant's Overtime Policy explicitly provides that non-exempt employees shall be paid overtime for hours worked in excess of 40 hours in a given workweek. (Ex. 2, Overtime Policy).

*See also* Ex. 3, Decl. of N. Monroe, ¶ 26 (testifying her team lead awarded a prize to the team member who had the most overtime in a given month).

Defendant's Timekeeping Policy, effective as of April 15, 2019, specifically states that "Off-the-clock work is prohibited" and requires employees be "compensated for the time spent working" regardless of whether the time was authorized by management. (Ex. 4, Timekeeping Policy, § 4.2.) Employees are directed "not [to] punch in until they are ready to go to their workstation and begin work, and should punch out as soon as their shift is completed and they are finished [working]." *Id.* § 4.1. If an employee returns to work "before the end of the meal period, the[y] will be paid as if they had worked their entire meal period." *Id.* §5.3. Should an employee's time record contain any inaccuracies, employees must report this immediately for correction to ensure they are compensated for all hours worked. *Id.* § 4.3. These requirements are reiterated in Defendant's "Recording Time Worked" policy, which requires employees to: (1) punch in when they are ready to begin work, (2) record their "time-out and time-in for lunch"; and (3) punch out when they are finished with their work. (Ex. 5, Recording Time Worked Policy.) This policy informs employees that any error in their time record must be corrected. *Id.*

## III. Agents Are Trained to Record All Hours Worked and Report Any Inaccuracies.

To reinforce its lawful policies, Defendant trains all of its Agents—companywide and throughout the recovery period—to be *on the clock* when starting or shutting down the computer programs and applications required to perform their work. *E.g.*, Ex. 6, Decl. of S. Yusuf, ¶¶ 7–8, 19) (testifying to new-hire and annual training on timekeeping policies and her "refresh" training for those she supervisors).

To start, Defendant does not dispute that its new-hire training is generally standardized and centrally prepared. *See, e.g.*, Ex. 7, Decl. of J. Sherman, ¶¶ 4, 5, 9; ECF #18–4, Decl. of K. Jackson, ¶5 ("The training Agents receive is substantially, if not entirely, the same[.]").

Second, Defendant's new-hire training unequivocally instructs Agents to be on-the-clock when starting or shutting down the programs and applications required to perform their work.[3] Defendant's new-hire training proceeds in two phases: onboarding with Human Resources (HR); and a subsequent, multiweek training covering the nuts and bolts of any given Agent's line of business and department. The HR training includes, among other things, modules such as the "Time Clock Policy" which states:

> It is extremely important that the following clock in/out procedures are followed.
>
> **Clock In/Out Procedures:**
>
> - Employees **MUST** clock into Kronos **PRIOR** to accessing **any other Walgreens systems** (Genesys, eSP, etc) **or performing any other job related function.**
>
>   [ * * * ]
>
> - Employees must discontinue to perform any job related functions and log out of all Walgreens systems (Genesys, eSP, etc.) **prior to clocking out of Kronos.**

(Ex. 8, "Time Clock Policy" Module, p.2) (emphasis original).) *See also* Ex. 9, Decl. of M. Beavan, ¶ 18) (testifying she received training akin to this module as part of her new-hire training). These explicit instructions are further emphasized in the Agents' subsequent, department-specific training. Trainers instruct all Agents as a "Day 1" topic that they should be *on-the-clock* whenever they are starting or shutting down the programs and applications required to perform their work. (Ex. 7, Decl. of J. Sherman, ¶¶ 4–5; Ex. 10, Decl. of K. Gonzalez, ¶¶ 5–6.) And this is not a fleeting

---

[3] Tellingly, Plaintiff and the two Opt-Ins do not specify what training they received regarding when to punch in or out during their shift. All three testify they received training on, to quote Plaintiff Jackson's testimony, "how to load and log into their computer programs at the beginning of the day, how to log out at the end of the day, how to track our time, the importance of attendance and schedule expectations, and Walgreen's policies relating to each topic." ECF #18-4, ¶5. *See also* ECF #18-5, 18–6, at ¶5. Plaintiffs conveniently do not explain specifically *when* this training or the underlying policies required them clock in or out.

message distributed to only a few Agents. The record shows that two trainers *alone*—Kenny Gonzalez and Jay Sherman, who also trained some of the Plaintiffs—imparted these instructions to thousands of Agents they trained across the country over the last decade. (Ex. 10, Decl. of K. Gonzalez, ¶¶ 1, 5–6; Ex. 7, Decl. of J. Sherman, ¶¶ 2–3, 5–6.)

In practice (and consistent with Defendant's policies), the boot-up procedure for remote[4] workers is as follows:

1.  Turn on or wake up their computer, depending on whether the Agent shut down their computer when last used;

2.  Connect to Walgreens' virtual private network ("VPN"), which should take less than one minute;

3.  Pull up a web browser, go to Kronos, and clock in—a process that should take only a few seconds; and

4.  Log into the rest of their work software, such as GWFM (the scheduler), Outlook (for email), Teams (for internal chats and video conferencing), Five9 or Genesys (the calling software, although the program varies by position) and OPE (which maintains patient profiles for patients who call)—a process that should cumulatively take a few minutes.

(Ex. 11, Decl. of T. Boyd, ¶¶ 5, 9; Ex. 12, Decl. of T. Hunter, ¶8; Ex. 9, Decl. of M. Beavan, ¶¶ 5, 9, 11; Ex. 6, Decl. of S. Yusuf, ¶¶ 5, 20; Ex. 7, Decl. of J. Sherman, ¶¶ 6, 12; Ex. 10, Decl. of K. Gonzalez, ¶6; Ex. 13, Decl. of A. Hosein, ¶¶ 4, 15.; Ex. 3, Decl. of N. Monroe, ¶13.)

For starting a meal break, an Agent need only:

1.  Set their work status to "break" (or some similar status) in Genesys or Five9, which takes a second or two;

2.  Clock out on Kronos.

(Ex. 11, Decl. of T. Boyd, ¶ 5; Ex. 12, Decl. of T. Hunter, ¶9; Ex. 9, Decl. of M. Beavan, ¶12; Ex. 6, Decl. of S. Yusuf, ¶¶ 9, 14; Ex. 7, Decl. of J. Sherman, ¶¶ 7, 12; Ex. 10, Decl. of K. Gonzalez, ¶6; Ex. 13, Decl. of A. Hosein, ¶¶ 6, 19; Ex. 3, Decl. of N. Monroe, ¶14)

---

[4] "Agents" who work on-site at a Walgreens office do not have to connect to a VPN—a step that briefly expedites the start up process for in-person workers. (Ex. 6, Decl. of S. Yusuf, ¶10) (testifying to needing to log on to VPN due to working remotely).

6

When returning from a meal break, the Agent need only:

1.  Wake up their computer if it fell asleep during break, which should take a second or two;

2.  Clock in on Kronos, which takes a second or two;

3.  Set their work status to "available" (or some similar status) in Genesys or Five9, which takes a second or two.

(Ex. 11, Decl. of T. Boyd, ¶ 5; Ex. 12, Decl. of T. Hunter, ¶10; Ex. 9, Decl. of M. Beavan, ¶12; Ex. 6, Decl. of S. Yusuf, ¶¶ 9, 16; Ex. 7, Decl. of J. Sherman, ¶¶ 7, 12; Ex. 10, Decl. of K. Gonzalez, ¶6; Ex. 13, Decl. of A. Hosein, ¶¶ 8, 20; Ex. 3, Decl. of N. Monroe, ¶14.)

When an Agent is ending their shift, the "shut down" process should go as follows:

1.  Close down all applications *other* than Kronos—a process that should cumulatively take a handful of seconds;

2.  Clock out on Kronos and close Kronos;

3.  Optional: Log out and/or shut down the computer, which would take a second or two to press the button and start the process.

(Ex. 11, Decl. of T. Boyd, ¶ 5; Ex. 12, Decl. of T. Hunter, ¶11; Ex. 9, Decl. of M. Beavan, ¶14; Ex. 6, Decl. of S. Yusuf, ¶ 17; Ex. 7, Decl. of J. Sherman, ¶¶ 8, 12; Ex. 10, Decl. of K. Gonzalez, ¶6; Ex. 13, Decl. of A. Hosein, ¶¶ 10, 21; Ex. 3, Decl. of N. Monroe, ¶11.)

Defendant also trains Agents how to correct missed or incorrect timecard punches and how to ensure they are paid for time spent correcting technical issues. *See, e.g.*, Ex. 10, Decl. of K. Gonzalez, ¶¶ 8–11; Ex. 13, Decl. of A. Hosein, ¶17; Ex. 9, Decl. of M. Beavan, ¶5; Ex. 3, Decl. N. Monroe, ¶16; Ex. 6, Decl. of S. Yusuf, ¶20). Timecard issues are fixed by notifying a supervisor and technical issues require that plus working with IT to solve the problem. *Id.*

For technical issues, a remote Agents' ability to log in can be impacted by their personal internet, the speed of the VPN, or other technical issues they may be experiencing on any given day. (Ex. 11, Decl. of T. Boyd ¶¶ 14-15; Ex. 12, Decl. of T. Hunter, ¶¶ 4–5; Ex. 9, Decl. of M. Beavan, ¶17.) Agents are compensated for time spent correcting technical issues. *Id. See also* Ex. 12, Decl. of T. Hunter, ¶¶ 6, 12. For example, Opt-In Clark requested timecard corrections on at

7

least two occasions due to personal issues logging in, which her managers approved. (Ex. 11, Decl. of T. Boyd ¶ 12-13.) *See also* Ex. 12, Decl. of T. Hunter, ¶¶ 6, 12 (testifying she was compensated for time spent resolving technical issues); Ex. 9, Decl. of M. Beavan, ¶17 (same); Ex. 13, Decl. of A. Hosein, ¶17 ("our policy is to give the employee the benefit of the doubt and pay them for the time starting from when they began trying to log in through the VPN").

**IV.    Defendant Uses Time Punches to Evaluate Attendance and Provides Grace Periods and Corrections for Reported Issues.**

Defendant's attendance policies and training materials show it evaluates attendance based on when an Agent is clocked in, not when they are ready to receive calls. Defendant's attendance policy directs Agents to "report to work on time[.]" (Ex. 14, Attendance Policy, p.2, § 2.) There is no requirement that an Agent be ready to receive calls before clocking in. Even if an employee "report[s] to work" a few minutes late, the policy empowers supervisors to excuse any tardiness— the policy simply asks managers to be consistent in how they do so. (Ex. 14, Attendance Policy, p.11, "General Information," Question 1) ("Yes, a manager may excuse an unscheduled absence or a partial day absence, as long as team members are afforded equal consideration."). Defendant's new-hire training to Agents is consistent with these principles. *See*, *e.g.*, Ex. 3, Decl. of N. Monroe, ¶17. And this flexibility for attendance is borne out in practice, with supervisors regularly permitting Agents to clock in five to seven minutes late without consequence. *See, e.g.*, Ex. 7, Decl. of J. Sherman, ¶13; Ex. 3, Decl. of N. Monroe, ¶17.

To ameliorate attendance concerns when starting or shutting down the programs and applications required to perform their work, Defendant provides Agents with various grace periods. When starting their shift, Agents have, at minimum, a ***paid*** seven-minute grace period— and sometimes more, depending on the supervisor. Ex. 11, Decl. of T. Boyd, ¶¶ 10–11; Ex. 10, Decl. of K. Gonzalez, ¶7(a); Ex. 9, Decl. of M. Beavan, ¶5(f)–(g) (she was permitted a grace period

that extended from 7 minutes before her scheduled shift to 4 or 6 minutes after her scheduled start time); Ex. 3, Decl. of N. Monroe, ¶13 (she was permitted a grace period that extended until after her shift was scheduled to start). Under this grace period, Agents may clock in seven minutes before their scheduled start time and get their various work applications up and running. This is ample time for Agents to clock in and start their software before commencing taking calls during their shift. *See, e.g.*, Ex. 7, Decl. of J. Sherman, ¶13; Ex. 3, Decl. of N. Monroe, ¶13. And Plaintiffs' time records demonstrate they regularly and consistently clocked in up to seven minutes before the start of their shifts. (Ex. 15, Decl. of Kim Wamsley, ¶¶ 6–11.)

For Agents returning from meal breaks, Defendant supplies a paid grace period—the record shows this varies by supervisor from three minutes to six minutes—so the Agents can, without incurring an attendance violation, punch in with Kronos and prepare their work applications. (Ex. 11, Decl. of T. Boyd ¶ 11 (team leader for Opt-In Clark);; Ex. 13, Decl. of A. Hosein, ¶¶ 9,15(d) (5-minute grace period); Ex. 3, Decl. of N. Monroe, ¶15 (3-minute grace period).

## V.     Defendant's "Schedule Adherence" Metric is Unrelated to Hours Worked, Compensation, or Attendance.

Defendant uses a "schedule adherence" metric to evaluate whether and ensure Agents are optimally productive during their work shift—*e.g*., whether they are taking a meal break, online and receiving phone calls, or engaging in other work off of the phones *when they are scheduled to* and are not engaging in "call avoidance." (Ex. 7, Decl. of J. Sherman, ¶18; Ex. 3, Decl. of N. Monroe, ¶¶ 18, 23, 25.) Defendant evaluates adherence based on an Agent's designated status on their phone software (*e.g*., "ready" for receiving calls; "not ready" for meal breaks, etc.). (Ex. 3, Decl. of N. Monroe, ¶¶ 6–9, 18 (explaining statuses); Ex. 7, Decl. of J. Sherman, ¶¶ 14–16.) Adherence is not based on an Agent's time punches in Kronos, although adherence (like timeclock punches) also has grace periods. *Id.*

9

Adherence expectations vary among supervisors and job roles—for example, the Clinical Escalations team does not place much (if any) significance on adherence because it is difficult to calculate. (Ex. 3, Decl. of N. Monroe, ¶¶ 21, 23 (adherence goals vary with supervisors and role); Ex. 7, Decl. of J. Sherman, ¶19 (he expects 92% performance metric for Agents he supervises)

Adherence can be negatively impacted if an employee does a task "early" or "late"—the focus is whether the Agent's status (*e.g.*, "ready" and receiving calls; "not ready" due to a meal break) is occurring *within* the scheduled block of time the Agent is supposed to be within said status. (Ex. 7, Decl. of J. Sherman, ¶16; Ex. 3, Dec. of N. Monroe, ¶25.) Thus, if an Agent is supposed to be "ready" on Genesys at the start of their shift, their adherence is negatively impacted if they log in to Genesys in any capacity before their scheduled shift, or if they have a status during their shift that is inconsistent with their schedule. *Id.*

Importantly, adherence is not used to determine attendance/tardiness, but can raise concerns under Defendant's "Work Avoidance" policy, which can result in discipline if an employee is manipulating their work status to avoid doing their duties. (Ex. 16, "Work Avoidance Policy" module, p.2; Ex. 7, Decl. of J. Sherman, ¶18.) However, if human error (such as forgetting to change a status) or technical issues negatively impact an Agent's adherence during a given shift, they may notify their supervisor to correct the issue and restore the employee's adherence. (Ex. 7, Decl. of J. Sherman, ¶19; Ex. 3, Decl. of N. Monroe, ¶22.)

## **LEGAL STANDARD**

The FLSA permits a plaintiff to maintain an action on behalf of herself and other employees ***only*** if they are "similarly situated." *See* 29 U.S.C. § 216(b). Plaintiff bears the burden of presenting sufficient evidence to make a factual showing that the employees to whom she seeks to send notice are in fact "similarly situated" to her with respect to whether an FLSA violation has occurred. *See Steger v. Life Time Fitness, Inc.*, 2016 WL 245899, at *2 (N.D. Ill. Jan. 21, 2016). To meet her burden, Plaintiff must

show that she and putative collective members are "similarly situated" in that they "were victims of a common policy or plan that ***violated the law***." *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1046 (N.D. Ill. 2003) (emphasis added). This is not a mere formality. *See Vazquez v. Ferrara Candy Co.*, 2016 WL 4417071, at *5 (N.D. Ill. Aug. 19, 2016). Indeed, courts in this District – including this Court – have refused to permit notice where the plaintiffs failed to provide sufficient evidence that potential collective action members were "similarly situated" with respect to the asserted violation. *See, e.g., Calloway v. AT&T Servs.*, 2024 U.S. Dist. LEXIS 57008, at *2 (N.D. Ill. Mar. 28, 2024) (denying conditional certification for call center case); *Steger*, 2016 WL 245899, at *2-4; *Forney v. TTX Co.*, 2006 WL 1030194, at *2-4 (N.D. Ill. Apr. 17, 2006); *Pfaahler v. Consultants for Architects, Inc.*, 2000 WL 198888, at *2-3 (N.D. Ill. Feb. 8, 2000). Here, Plaintiff offers no evidence of a common unlawful policy or practice to which she and the thousands of Agents to whom she wants to send notice were subjected.

## ARGUMENT

### I.     The Court Should Decline To Apply The Two-Phased Certification Process.

Should this Court deny Defendant's pending Motion to Stay Conditional Certification (ECF #23), Defendant asks this Court to reject the "modest" two-step *Lusardi* standard in favor of the Fifth Circuit's "rigorous" standard articulated in *Swales v. KLLM Transp. Servs., LLC*, 985 F.3d 430–43 (5th Cir. 2021). Courts have "wide discretion" to determine how these suits should proceed. *Weil v. Metal Techs., Inc.*, 925 F.3d 352, 357 (7th Cir. 2019); *Fillipo v. Anthem Companies, Inc.*, 2022 WL 18024818, at *1 (S.D. Ind. Dec. 30, 2022) ("[T]he two-step process is not in the statute, 29 U.S.C. § 216(b), and the Seventh Circuit does not require it."). To that end, the Fifth Circuit in *Swales* reasoned "a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of 'employees' is 'similarly situated.' And then it should authorize preliminary discovery accordingly." *Swales*, 985 F.3d at 441. "[A]ddressing these issues from the outsets aids the district court in deciding whether notice

is necessary" and "ensures that any notice sent is proper in scope—that is, sent only to potential plaintiffs." *Id.* at 442. And as part of its review, "the district court needs to consider all of the available evidence." *Id.* Should this Court apply *Swales*, it will not be the first in this Circuit to do so. *See, e.g.*, *Laverenz v. Pioneer Metal Finishing, LLC*, 2024 WL 3887110, at *6–8 (E.D. Wis. Aug. 21, 2024) (rejecting *Lusardi* as contrary to statute and Supreme Court precedent; as arming plaintiffs with unwarranted "substantial settlement leverage"; and noting *Lusardi* "risks crossing the line from using notice as a case-management tool to using notice as a claims-solicitation tool").

In contrast, the *Lusardi* standard provides notice to potential opt-in plaintiffs if a plaintiff makes a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Flores*, 289 F.Supp. at 1045. "Conditional certification is not automatic and not a mere formality." *Calloway v. AT&T Servs., Inc.*, 2024 WL 1328823, at *2 (N.D. Ill. Mar. 28, 2024). This is because "a plaintiff's discovery demands upon conditional certification may impose 'a tremendous financial burden to the employer'" and "courts must be careful to guard against wasting the parties' time and resources where certification is not appropriate at the outset." *Woods v. N.Y. Life Ins. Co.*, 686 F.2d 578, 579-81 (7th Cir. 1982). The "modest factual showing" requires factual support outside of the complaint, such as in the form of an affidavit, declaration, or other support beyond a plaintiff's allegations. *Id.* "In making a determination as to similarity, the court need not accept the plaintiff's allegations as true as it would with a motion to dismiss." *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 751 (N.D. Ill. 2011). When a plaintiff fails to provide sufficient evidence, conditional certification should be denied, as "it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated." *Adair v.*

*Wis. Bell., Inc.*, 2008 WL 4224360, *4 (E.D. Wis. Sept. 11, 2008). Defendant urges the Court to exercise its discretion and apply the *Swales* framework to avoid undermining both the goals and text of the FLSA. But even under the *Lusardi* standard, Plaintiff's Motion fails.

## II. There is No Evidence of An Unlawful Policy, Let Alone a Collective-Wide One.

Under any standard, the Court should not authorize notice to the proposed putative collective unless Plaintiff shows (1) she was victimized by a policy or practice that violated the FLSA, and (2) this unlawful policy or practice affected similarly situated employees. Plaintiff falls short on both fronts. First, Plaintiff's evidence shows that she and two others had an isolated, incorrect (and self-defeating) misunderstanding of Defendant's timekeeping and attendance policies—which is not a basis to conditionally certify a nationwide, 13,500-strong collective action. Second, Plaintiff's effort to show some collective-wide illegal practice is based on nothing more than conclusory, unsupported statements (which also lack foundation) about the timekeeping practices of an unspecified number of unidentified colleagues during an unstated period (or periods) of time. Accordingly, conditional certification should be denied—it is not a close call.

### A. Plaintiff Fails to Evince An Unlawful Common Policy or Practice.

Plaintiff's evidence does not meet her burden of showing an unlawful common policy or practice—even as applied to the three Plaintiffs, let alone for thousands of purported similarly-situated employees. Plaintiff's evidence comprises three boilerplate declarations and a handful of Defendant's job postings. Distinct issues plague both but lead to the same result: they are insufficient to demonstrate anything more than the Plaintiffs' (mistaken) *personal belief* as to what Defendant's policies are, which cannot be a basis for conditional certification.

The job postings can be quickly set aside. (ECF #18-7). This is an off-the-clock case. Plaintiff is not arguing her position was misclassified. Her cited job postings therefore are relevant only to the extent they spell out Defendant's timekeeping policies and make clear each applicant

goes through the boot up and shutdown process Plaintiff alleges. Yet the job postings do neither. Defendant's timekeeping policies go unmentioned (as one might expect from a job posting), and the job duties are described so generically as to provide no insight on the boot up or shut down process at issue in this lawsuit. The job postings, in other words, do not move the needle for Plaintiff's necessary factual showing.

Plaintiff's declarations, for their part, have three relevant categories of testimony:

1.  Walgreens' policies, practices, and directives "required" them to boot up and shut down off the clock, without offering any more specifics;

2.  Plaintiffs spoke with some unidentified number of other "Agents" (job titles or locations unknown) and learned these agents had similar experiences; and

3.  Plaintiffs "had" to boot up and shut down off the clock to avoid attendance or adherence issues.

(ECF #18-4, 18-5, & 18-6 at ¶¶ 10–12, 19, 22–24.)

The **first** category of testimony—that Defendant "required" all Agents to load or close their work programs off-the-clock—is conclusory and not based on any personal knowledge. *See e.g.*, ECF #18-4, Decl. of K. Jackson, ¶¶ 10, 19. To start, Plaintiffs simply do not speak to any of Defendant's *actual* timekeeping policies, which explicitly prohibit off-the-clock work. Plaintiffs all testify they were trained on how to boot up and shut down their work programs. *Id. at* ¶¶ 4, 7–8. But they conveniently stop short and omit the key point: what was their training regarding *when* to clock in (before/after loading or shutting down their programs)? They do not testify that any supervisor ever directed them to work off-the-clock while loading or shutting down their programs. Plaintiffs do not have any specific testimony about policies, their training, or what their supervisors instructed them to do—let alone any evidence that could apply to the proposed collective.

The closest Plaintiffs come to correcting these critical omissions is Paragraph 19 in their respective declarations, which is identical for each: "Pursuant to Walgreens' policies, training, and

14

direction, Agents are required to 'clock out' of Defendant's timekeeping before closing all work applications and systems to make certain they are 'clocked out' the moment they stop fielding calls." (ECF #18-4, 18-5, 18-6, at ¶19). Their broad and conclusory assertion that all 13,500-plus putative collective members also interpreted Defendant's policies and training materials as they did has no admissible evidentiary support. Plaintiffs lay no foundation for how they have the personal knowledge to offer such broad testimony. They also offer no specifics: What training or policy did Walgreens offer to all of its agents instructing them to work off the clock? What "directive" to work off-the-clock is every agent getting and from whom? Plaintiffs' evidence on this front are simply conclusory allegations that happen to be under oath. This type of "evidence" is routinely rejected by courts, even at the conditional certification stage.[5] And Plaintiffs cannot salvage this testimony by pointing to supposed conversations with other Agents.

Plaintiffs' **second** category of testimony—about conversations with "many" other Agents about Defendants "compensation policies . . . and its failure to pay Agents for all work performed"—is simply incompetent evidence. *See e.g.* ECF #18-4, ¶¶ 22–23. To start, these conversations can *only* be hearsay, as they are offered for the truth of the matter asserted (*i.e.*, that other workers are having the experiences they allegedly relayed to the Declarants). Inadmissible hearsay is not competent evidence, even at the conditional certification stage.[6] The Declarants'

---

[5] *Bradley v. Arc of Nw. Ind., Inc*., 2015 U.S. Dist. LEXIS 60985, at *10-11 (N.D. Ind. May 11, 2015) (two affidavits submitted by plaintiff were clearly insufficient to meet the modest factual showing standard for conditional certification and stating that "[o]nce proffered, an affidavit is subject to scrutiny, and "bare assertions" lacking any substantive detail are insufficient for a plaintiff to meet his or her burden) (citing *Allen v. Payday Loan Store of Ind., Inc.*, 2013 U.S. Dist. LEXIS 169971, at *4,19-20 (N.D. Ind. Dec. 3, 2013) (if declarations in support of conditional certification were not required to be more probative than bare allegations, the requirement of factual support would be superfluous)). *See also Reyes Cruz v. 70-30 Austin St. Bakery Inc*., 2019 WL 1929910, at *6 (S.D.N.Y. May 1, 2019) (denying conditional certification where Plaintiff only offered conclusory testimony about his working conditions and conclusion others faced the same conditions based on his conversations with them).

[6] *Boyd v. Alutiiq Glob. Sols., LLC,* 2011 U.S. Dist. LEXIS 88656, 2011 WL 3511085, at *5-6 (N.D. Ill. Aug. 8, 2011) (hearsay evidence inadmissible to support a motion for conditional certification); *Adair*, 2008 WL 4224360, at *8 (concluding evidence must be admissible for conditional certification); *Acevedo v. Ace*

"conversation" testimony also lacks any foundation—*i.e.*, the Declarants do not offer any detail about *who* they spoke with, *how many* people they spoke with, *where* these employees worked, *when* these conversations happened, whether these employees ever were not paid overtime due to off-the-clock work, or even whether these conversations related to the timeframe or off-the-clock issues alleged in this lawsuit. Such sparse detail has doomed similar declarations at conditional certification. *See, e.g., Adair*, 2008 WL 4224360, at *9–10. Furthermore, this testimony (even if competent evidence, which it is not) cannot bridge the inferential gulf to Plaintiff's desired collective: these handful of alleged conversations are simply too thin a reed to support the notion that 13,500-plus employees had similar experiences.[7] And to that end: Plaintiff's purported collective includes both remote and *in-person* "Agents." Plaintiff has zero evidence speaking to the experiences of the roughly 6,400 in-person Agents who would be part of the collective. The

---

*Coffee Bar, Inc.*, 248 F.R.D. 550, 555 (N.D. Ill. 2008) ("Despite the liberal standard at step one of conditional certification, courts still require plaintiffs to make factual allegations supported by *admissible* evidence.") (emphasis added).

[7] *Boyd*, 2011 WL 3511085, at *5-6 (denying notice to purported collective of thousands of employees, finding testimony about declarant's conversations insufficient when "Plaintiffs do not identify to whom they spoke, when those conversations occurred, where they occurred, or what specifically was discussed that would lead them to conclude that pay practices were 'consistent.'"); *Amandah v. Alro Steel Corp.*, 2020 U.S. Dist. LEXIS 151723, at *5-11 (E.D. Wis. Aug. 21, 2020) (two worker declarations from the same warehouse insufficient to conditionally certify a class of 1,500 employees across 73 warehouses); *Tom v. Generac Power Sys.*, 2018 U.S. Dist. LEXIS 130629, at *15–17 (E.D. Wis. Aug. 3, 2018) ("The mere fact that [the three declarants] claim that they each individually worked without compensation between their clock times and their scheduled shift times—or even their claims that they observed others performing such work—are insufficient to make even a modest factual showing that [defendant] maintains a policy that fails to compensate more than 1,200 workers for several minutes of work each shift."); *Wynn v. Express, LLC*, 2012 WL 874559, at *4 (N.D. Ill. Mar. 14, 2012) (denying conditional certification, concluding declarations from only a handful of employees could not justify conditional certification); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045-46 (N.D. Ill. 2003) (rejecting conditional certification of collective with eight opt ins, finding that affidavits from "two out of fifty employees (four percent of Defendant's workforce) does not rise to the level of a common policy or plan" in an off the clock case). *See also Hickmon v. Fun & Fit LLC*, 2021 WL 3578296, at *6 (S.D.N.Y. Aug. 13, 2021) (denying motion to conditionally certify collective where plaintiff did not provide details "such as the names of other employees, when any conversations with those employees took place, and information regarding the hours those employees worked or how they were paid"); *Modise v. Careone Health Services, LLC*, No. 3:20-cv-00765 (KAD), 2021 WL 3421711, at *5 (D. Conn. Aug. 5, 2021) (rejecting testimony that other employees had "similar experience[s]" as the declarant, but stopping short of alleging whether the other employees experienced the same alleged FLSA violation).

record shows such employees would not have to connect to the VPN, which would spare them some bootup time. Ex. 6, Decl. of S. Yusuf, ¶10. *Cf.* Ex. 12, Decl. T. Hunter, ¶5.

Plaintiffs' **third** (and final) category of testimony—concerning their reaction to Defendant's attendance policy and adherence metric—is just that: a *reaction* to Defendant's lawful policies, and a mistaken one at that, because it directly contradicts Defendant's timekeeping policy and training materials. *E.g.*, (ECF 18-4, ¶¶ 11–12). Plaintiffs all testify that "in order to comply with Walgreens' schedule adherence requirements" and avoid being "tardy," they had to load their work programs before punching in their timecards. *Id.*

The issues with this testimony are numerous. To start, for Defendant to be liable for off-the-clock work on Plaintiffs' theory, both the Plaintiffs' and every collective member's manager must have been aware they were booting up or shutting down off the clock. *See, e.g.*, *Blakes v. Ill. Bell Tel. Co.*, 75 F. Supp. 3d 792, 809–811 (N.D. Ill. 2014) (discussing cases; summary judgment for FLSA defendant due to lack of constructive knowledge of off-the-clock work). Yet, Plaintiffs do not offer this testimony, either on their or anyone else's behalf. This alone is fatal—to say nothing of the thousands of inquiries and "mini trials" necessary to ascertain such information.

Plaintiffs also do not testify to what Defendant's "adherence requirements" or attendance policy *are*—leaving it to Defendant to fill in the blanks. Attendance and adherence in fact do not prevent compensation for time worked when not clocked in to Kronos or somehow override Defendant's timekeeping policies. Rather, they are different means of helping ensure workers show up on time and work optimally and efficiently during their shifts, without call avoidance. *E.g.*, Ex. 7, Decl. of J. Sherman, ¶18. There is nothing unlawful about this.[8] Moreover, Defendant's

---

[8] Courts have routinely held that other performance metrics—such as sales goals—are an insufficient common policy for conditional certification. *See, e.g.*, *Steger*, 2016 WL 245899, at *3; *Richie v. Blue Shield of California*, 2014 WL 6982943, at *9-11 (N.D. Cal. Dec. 9, 2014) (denying motion based on argument that employee "felt pressure to work off the clock because of Blue Shield's 125% productivity goals. . . .");

attendance and adherence policies both give "Agents" a roughly 12-minute window (7 minutes before shift and 5 minutes after the shift start) to clock in and boot up without consequence. *E.g.*, Ex. 9, Decl. of M. Beavan, ¶5(f)–(g). If more time is needed due to a technical issue, their time cards and adherence can be corrected so there are no consequences from a payroll, attendance, or adherence standpoint. Plaintiffs do not address or contradict any of these points, and it can't be for lack of awareness: the record shows they all availed themselves of Defendant's grace periods, regularly clocking in early and clocking out after the end of their shifts, or requesting timecard corrections (which were granted). *Id*. Indeed, the record shows Plaintiffs consistently clocked in or out before their scheduled shift, showing they were actually paid for their claimed pre-and post-shift time and belying the alleged pressure they felt from Defendant's attendance policy or adherence metrics. But even setting all of that aside, even on its own terms, Plaintiff's "pressure" theory is self-defeating in nature. The precise step Plaintiffs testify they take to supposedly *improve* their "adherence" score—*i.e.*, boot up off the clock before their shift start time,—actually *hurts* their adherence score. (Ex. 7, Decl. of J. Sherman, ¶16.) In other words, Plaintiff's theory of the case requires the collective choose to harm itself, forgoing both compensation *and* their adherence scores for no apparent benefit.

Thus, Plaintiff's testimony about attendance and adherence boils down to their *reaction* to Defendant's attendance or adherence standards, either due to a misinterpretation of these standards or a conscious choice to not comply with them. But a plaintiff's errant *reaction* does not constitute a companywide unlawful *policy*, and cannot be the basis for conditional certification. *See, e.g.*,

---

*Richardson v. Wells Fargo Bank, N.A.,* 2012 WL 334038, at *5-6 (S.D. Tex. Feb. 2, 2012) (policies complied with FLSA, even though plaintiffs said they could not complete assigned tasks within 40 hours); *Blakes v. Ill. Bell Tel. Co.*, 2013 U.S. Dist. LEXIS 176496, at *44–45 (N.D. Ill. Dec. 17, 2013) (denying conditional certification when evidence comprised "speculative fear of what could happen if they fell into the bottom quintile" of a performance metric).

*Tom*, 2018 U.S. Dist. LEXIS 130629, at *15–17 (conditional certification denied where plaintiff worked off the clock "of his own accord, without the authorization of his supervisors, and contrary to company policy"); *Blakes*, 2013 U.S. Dist. LEXIS 176496, at *44–45 ("speculative fear of what could happen if they fell into the bottom quintile" of a performance metric was insufficient); *Richardson*, 2012 WL 334038, at *5 ("Subjective beliefs or fear about logging overtime hours is insufficient to establish an actual company-wide policy."). Plaintiff's evidence therefore falls short of providing even a "modest showing" of any unlawful policy or practice, be it as applied to them or collectively.

### B. The Remaining Evidence Belies Any Unlawful Common Policy or Practice.

Plaintiff's evidence does not meaningfully speak to Defendant's *actual* policies, training, or practices and, at best, presents the experience of three individuals who represent 0.0002% of the 13,500-plus collective they seek to certify. While the Court (under *Lusardi*, at least) does not resolve credibility issues at this stage, the Court is still obligated to view the record as a whole when evaluating conditional certification. Defendant's explicit policies and training materials constitute unrebutted evidence. At this stage, Defendant does not challenge Plaintiff's isolated misunderstandings of the same, but there is no evidence their isolated misunderstanding was shared by the entire collective.

To that end, the record is unambiguous: Defendant has no systemic unlawful policy to force "Agents" to launch and shut down their work applications off the clock. *See Tom*, 2018 U.S. Dist. LEXIS 130629, at *12 ("Where there is evidence that employers have, and enforce, appropriate pay policies, that evidence weighs strongly against conditional certification.").

At a policy level, Defendant pays overtime; prohibits off-the-clock work; requires employees accurately report all hours worked (including time spent starting or shutting down programs and applications required for their work); and provides a means for correcting missing

or errant time punches. *E.g.*, Ex. 4, Timekeeping Policy. From a training standpoint, Defendant's standardized training reinforces its lawful policies by instructing all Agents be *on the clock* when starting or shutting down work programs. *See, e.g.*, Ex. 8, "Time Clock Policy" module. At the supervisor level, the record shows supervisors reinforce these rules and, further, work with Agents to correct time card issues caused by human error or technological issues. *E.g.*, Ex. 6, Decl. of S. Yusuf, ¶¶ 19–20; Ex. 12, Decl. of T. Hunter, ¶7 (testifying that her supervisor, Teresa Boyd, trained her to be on the clock when booting up or shutting down). Putative collective members who were in the same trainings Plaintiffs attended testified they were trained on the aforementioned policies, and, what's more, Plaintiffs personally took advantage of Defendant's grace periods and corrections process. *See* Ex. 12, T. Hunter, ¶2 (attended training with Clark); Ex. 7, J. Sherman, ¶¶ 2, 5 (discussed rules in trainings and trained Jackson); Ex. 9, Decl. of M. Beavan, ¶4; (Ex. 11, Decl. of T. Boyd, ¶ 13 (Clark requested and received time card corrections). Finally, Defendant's "adherence" metric and attendance policy are lawful and do not require or force Agents to start or close work applications off the clock. Ex. 3, Decl. of N. Monroe, ¶18. Adherence and attendance policies are not unlawful under the FLSA, and nor is their application here.

Defendant has no systemic unlawful policy or practice meriting notice to over 13,500 Agents. Plaintiffs' limited experience boils down to their individualized *reaction to and interpretation of* Defendant's lawful policies. Defendant's policies, training, and practices are designed to ensure "Agents" are paid for their time loading and closing their work applications.

## III. Individualized Inquiries Render Collective Action Treatment Inappropriate.

Even if *arguendo* Plaintiffs evinced the unlawful practice they allege—*i.e.*, "Agents" are collectively "required" to start and close their work applications while off the clock—conditional certification would not be warranted because the proposed collective requires an unmanageable series of individualized assessments that would require thousands of "mini trials". A court may

deny conditional certification if "the adjudication of multiple claims . . . would require the parties, the Court, and perhaps eventually a jury, to engage in an unmanageable assortment of individualized factual inquiries." *Brianas v. Under Armour, Inc.*, 2018 WL 2184448, at *2 (D. Md. May 11, 2018). In making this determination, courts "have a responsibility to avoid the 'stirring up' of litigation through unwarranted solicitation." *Id.*

Here, collective-wide analysis of Plaintiff's claims is functionally untenable. Although Plaintiff's Motion speaks in terms of generally applicable policies and procedures, their evidence tells a different story. Plaintiffs' testimony shows the purported common policy underpinning Plaintiff's Motion is the pressure caused by Defendant's attendance policy and adherence metrics—a pressure Plaintiffs claim prompts them to boot up and shut down off the clock. But there is nothing inherently unlawful about attendance or adherence policies, and neither has anything to do with Defendant's timekeeping policy. For example, an employee can be both "tardy" and in "non-adherence" *and* clocked in and compensated for their time. Ex. 7, Decl. of J. Sherman, ¶17. Moreover, Plaintiffs' "solution" to any alleged pressure is self-defeating because starting their programs before their scheduled shift or grace period hurts their adherence unless they request a correction from their supervisor. In contrast, booting up within a grace period or during their scheduled shift causes no attendance issues, and any adherence issues can be corrected.

So, how would the Parties and the Court be able to determine which of the 13,500-plus members of the Plaintiffs' proposed collective opted for such a self-defeating choice, be it due to a misinterpretation of Walgreens' undisputed policy, or a conscious choice to not comply with that policy? And, did the managers for any such collective members know of the member's actions— and did they correct the issue, and, if not, was the time *de minimis*? The answer to these questions is far afield from any productivity spreadsheet or official policy, and instead resides deep in the

21

individual circumstances and psyche of each collective member. *See, e.g.*, *Blakes*, 2013 U.S. Dist. LEXIS 176496, at *44–45 (denying conditional certification because the degree to which a given collective member felt "pressured" to work off-the-clock by performance metrics varied with the member's "daily assignments, their own past performance statistics, and their personal tolerance for the risk of falling into the bottom efficiency quintile.")

Furthermore, Plaintiffs' theory relies on the notion that it took "too long" for all collective members to boot up and shut down their work applications, contributing to the pressure to do so off the clock. But Plaintiff's Motion recognizes the amount of time it takes to sign in or out of programs is "dependent on how fast/slow the computers and programs were operating." (ECF #18-4, ¶ 9.) For this reason alone, Plaintiff's proposed class will require a highly individualized inquiry to determine the time involved in signing in for the day, back in for their break, and signing out for their shift. To evaluate how long it takes a collective member to boot up off the clock— meaning, by necessity, there is not a timecard entry to evaluate—will require an investigation into each collective members tech setup (*e.g.*, how fast and reliable is their WiFi?); their personal practices (*e.g.*, do they leave their computer on after every shift and have their programs hot-linked, saving time on bootup?); whether the employee faced technical issues, and how long it took to address them (*e.g.*, how quickly was IT able to respond and fix the problem?); and so on. None of these factors can be fulsomely evaluated by simply looking at a timecard. There is no ready document or database that would capture how long a given Agent (let alone more than 13,500 of them) spent trying to boot up each shift in such a scenario. Moreover, each instance of identified off-the-clock work would also need to be cross-referenced with time cards, payroll records, and internal communications to see if the employee reported the issue and was compensated for it. Considering the idiosyncratic nature of each employees' practice in logging in and out each day,

the determination of whether any violation occurred would require an individualized, case-by-case

analysis. Such an investigation is thus unfit for certification. *See Steger*, 2016 WL 245899, at \*4

(highly individualized inquiries "substantially eliminate the judicial efficiency, and the resulting

benefit to the parties, traditionally attained through the collective treatment of claims").

## IV. Plaintiff's Proposed Notice and Notice Process Should Be Modified.

If the Court grants Plaintiff's Motion, Plaintiff's proposed notice, ECF No. 18-2, should be

modified and the means by which Plaintiff wants to send notice should be curtailed:

- Plaintiff's proposed vague and overbroad collective definition should be clarified and narrowed. *Ruffolo v. LaSalle Grp., Inc.*, 2019 WL 978659, at \*6 (N.D. Ill. Feb. 28, 2019) (narrowing collective definition because it gave no indication of the alleged common unlawful policy)[9]. Here, Plaintiff's proposed notice is vaguely addressed to "All current and former hourly call center agents who worked for [Defendant] at any time during the last three years" and the collective definition is listed as "All similarly situated current and former hourly call center agents who worked for Defendant at any time during the last three years." (ECF No. 18-2 at 1; ECF No. 18 at 24). Plaintiff's proposed definition does not explain who should determine whether job titles and duties are sufficiently "similar" to merit notice, or how that determination should be made, and the definition does not give any indication of the common unlawful policy or practice Plaintiff alleges. Plaintiff cites no authority for conditional certification of such a vague and undefined collective. It is also unclear to whom any notice could or should be sent, because Defendant did not use the title "Call Center Agents" or other job titles matching Plaintiff's proposed definition. Plaintiff attached job postings for front-end and back-end Pharmacy Technicians, (*see* ECF No. 18-7), and the declarants own job titles were "Pharmacy Technician" and "Centralized Specialist" (*see* ECF Nos. 18-4, 18-5, 18-6). Plaintiff's proposed collective is inherently vague and ambiguous, given the imprecise reference to "similarly situated call center agents." Plaintiff's proposed collective definition is confusing, misleading, and vague, and these threshold definitional flaws further underscore that this case is neither maintainable nor manageable as a nationwide collective action.

- Notice via text message is unnecessary and overly intrusive, as most people would not expect to receive unsolicited business communications via text message and notice via regular and electronic mail is sufficient. *Piazza v. New Albertsons, LP*, 2021 WL 365771, at \*8 (N.D. Ill. Feb. 3, 2021)[10]; *Wilmoth v. Steak N Shake, Inc.*, No. 2022 WL 1913026, at

---

[9] *Smith v. Family Video Movie Club, Inc*., 2015 WL 1542649, at \*7 (N.D. Ill. Mar. 31, 2015) (modifying collective definition); *Muir v. Guardian Heating & Cooling Services, Inc*., 2017 WL 959028, at \*8 (N.D. Ill. Mar. 13, 2017) (same); *Walker v. Honghua Am., LLC*, 870 F. Supp. 2d 462, 472 (S.D. Tex. 2012) (court "has the power to modify an FLSA collective action definition on its own").

[10] (Citing *Slaughter v. Caidan Mgmt. Co., LLC*, 317 F. Supp. 3d 981, 994 (N.D. Ill. 2018) (denying request for notice by text message as "unnecessary and overly intrusive," "[a]bsent some showing that U.S. mail

*4, 6-7 (S.D. Ind. June 3, 2022) (same; "Courts have occasionally permitted the use of text messaging where potential opt-in plaintiffs regularly travel for work or work in remote locations, or where plaintiffs' counsel has submitted evidence showing a need or preference for text messaging, none of which is the case here.") (citing cases); *Babayemi v. Now Courier, Inc.*, 2023 WL 8236987, at *11 (S.D. Ind. Nov. 28, 2023) (text messages not appropriate and overly intrusive unless recipients are transient, live in locations without reliable mail service, or where texts were primary means to communicate).

- It is also unnecessary to provide any potential collective members' telephone numbers, as it constitutes sensitive information and Plaintiff has made no showing as to why such personal information is necessary at this time. *Clugston v. Shamrock Cartage & Spotting Servs.*, 2014 WL 5502455, at *5 (S.D. Ind. Oct. 30, 2014) (citing cases).[11] Telephone numbers would also permit Plaintiff's counsel's direct solicitation of clients and there is no protective order in place to limit the use of this information for its intended purpose.

- Any email addresses provided should be limited to last known personal email addresses, as opposed to workplace information, which is unnecessary. *Wilmoth*, 2022 WL 1913026, at *8 (notice sent to last known personal email addresses); *Carrel v. Medpro Grp., Inc.*, 2016 WL 4884157, at *4 (N.D. Ind. Sept. 15, 2016) (same).

- Sending a reminder notice is unnecessary, as this may be misinterpreted as the Court urging and encouraging individuals to join the lawsuit. *Piazza*, 2021 WL 365771, at *8; *Hudgins v. Total Quality Logistics, LLC*, 2016 WL 7426135, at *6 (N.D. Ill. Dec. 23, 2016) (rejecting reminder notice because "[a]bsent any evidence that notice via first-class mail and e-mail is ineffective, these additional forms of notice are unnecessary and overly intrusive."); *DePyper*, 2020 WL 6565225, at *5 (denying reminder notice); *Slaughter*, 317 F. Supp. 3d at 992 (same); *Babayemi*, 2023 WL 8236987, at *12 ("reminder notices [by any means] could be misinterpreted as the Court encouraging individuals to opt-in.").

- Plaintiff's proposed notice is unbalanced. It contains 13 lines (across 2 paragraphs) of text describing Plaintiff's claim, but only a mere one and one-half lines of text about Defendant's position on the lawsuit, containing only a vague denial, and there is no description about Defendant's position in the reminder notice. The reminder notice is misleading in that it says recipients "may be eligible to receive unpaid overtime wages that

---

and email notice will not reach prospective class members"); *Muir v. Guardian Heating & Cooling Servs.*, 2017 WL 959028 (N.D. Ill. Mar. 13, 2017); *DePyper v. Roundy's Supermarkets, Inc*., 2020 WL 6565225, at *4 (N.D. Ill. Nov. 9, 2020) (same))

[11] *See also Andrade v. Aeroteck, Inc*., No. CCB08–2668, 2009 WL 2757099, at *1 n. 1 (D.Md. Aug. 29, 2009) (phone numbers unnecessary unless mailed notice is returned as undeliverable); *Babayemi*, 2023 WL 8236987, at *11 ("request for phone numbers and to send text messages is inappropriate"); *Drummond v. Am. Fam. Mut. Ins. Co., S.I.*, 2023 WL 2770563, at *3 (W.D. Wis. Apr. 4, 2023) ("this court generally does not require disclosure of phone numbers for potential members of a collective action, as residential and email addresses should be adequate to provide notice."); *see also Martinez v. Cargill Meat Sols*., 265 F.R.D. 490, 501 (D. Neb. 2009) (no evidence defendant was unable or unwilling to provide correct and current addresses for its employees, so no evidence supporting request for personal phone numbers)

are owed to you." (ECF No. 18-3.) The language that unpaid wages "are owed" incorrectly suggests that the recipient is indeed owed wages; no determination has been made.

- The proposed temporal scope of the opt-in limitations period is incorrect. The lawsuit commences as to each opt-in depending on the date each individual opt-ins by filing a notice of consent to join the lawsuit. 29 U.S.C. § 256(b). Plaintiff improperly measures the opt-in limitations period reaching three years from the date she filed her lawsuit (May 21, 2024). Such a collective period far exceeds the statute of limitations, even after accounting for the limited tolling Defendant agreed to from September 17, 2024 to January 6, 2025.

- The proposed notice states: "If Plaintiff prevails, Plaintiff's counsel will seek an order requiring Defendant to pay their reasonable attorneys' fees and expenses", but fails to explain that costs may be imposed upon them in the event that Defendant prevails in this litigation. *See e.g., Fosbinder-Bittorf v. SSM Health Care of Wisconsin, Inc*., 2013 WL 3287634, at *7 (W.D. Wis. Mar. 21, 2013) (approving language that opt-ins would not be expected to pay Plaintiff's lawyers fees or costs only if the notice also stated: "If you do not prevail on your claim, court costs and expenses may possibly be assessed against the class."); *Atkinson v. TeleTech Holdings, Inc.*, 2015 U.S. Dist. LEXIS 23630 at *14 (S.D. Ohio Feb. 26, 2015).

- Finally, the notice should also not go to any putative collective member who has previously waived or settled any FLSA claims with Defendant within the recovery period.

Accordingly, if the Court grants Plaintiff's Motion, it should narrow and revise the notice as set forth herein and give the Parties 21 days to meet and confer regarding these disputed issues and submit any additional remaining disputes to the Court for determination.[12]

## CONCLUSION

For the reasons stated above, Defendant respectfully requests this Court deny Plaintiff's Motion for Conditional Certification and award further relief as this Court deems warranted.

---

[12] *E.g.*, the proposed Notice reads "If you meet the definition for the Collective group identified in Section 3, you **are eligible** to participate in this lawsuit," when it should read "…you **may be** eligible to participate in this lawsuit." This is because, for example, an individual who meets the collective definition, but worked a part-time schedule below 40 hours/week or was on a leave during the statutory period, will not be eligible.

DATED: January 6, 2025    Respectfully submitted,

           WALGREEN PHARMACY SERVICES
           MIDWEST, LLC, Defendant


           By: *Kyle Petersen*        
            One of Its Attorneys



## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on January 6, 2025, she caused the foregoing to be filled with the Clerk of the Court via the Court's electronic case filing/ECF system, causing the Motion to be distributed to all counsel and parties of record.

           */s Bryan Vayr*    
           Bryan Vayr